Harold M. Rosen v. Commissioner. Leo S. Rosen v. Commissioner.
Rosen v. Commissioner
Docket Nos. 2775, 2776.
United States Tax Court
1945 Tax Ct. Memo LEXIS 67; 4 T.C.M. (CCH) 938; T.C.M. (RIA) 45310; October 3, 1945
*67 Held on the facts that in the taxable year petitioners were not carrying on business in partnership with their wives within the meaning of the revenue laws, and that petitioners are taxable on the entire income from their business. Samuel R. Rosenthal, Esq., 77 W. Washington St., Chicago, Ill., and C. Claire Moore, C.P.A., for the petitioners. Richard L. Greene, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion These consolidated proceedings involve income tax deficiencies for the calendar year 1941 in the following amounts: Docket No. 2775
$7,366.41
Docket No. 2776
6,309.91
The question for decision is whether the entire income of the American Grease Stick Company, a partnership, is taxable to the petitioners or whether a portion thereof is taxable to their wives - in other words, whether a valid bona fide partnership existed between the petitioners and their wives. Certain minor adjustments made by the Commissioner are uncontested. Findings of Fact Petitioners are brothers, residing at Muskegon, Michigan. Marcia S. Rosen is the wife of petitioner, Harold M. Rosen. Marcia and Harold filed separate income *68 tax returns for the calendar year 1941 with the Collector of Internal Revenue for the District of Michigan. Florence Rosen is the wife of petitioner, Leo S. Rosen. They, too, filed separate income tax returns for the calendar year 1941 with the Collector for the District of Michigan. Prior to 1931, Harold had been in the service station business for a number of years. During that period he originated and developed a stainless lubricant stick for use on car door fittings. He sold his service station business in the fall of 1931 and commenced manufacturing and selling the lubricant, doing business under the name American Grease Stick Company. The lubricant stick was sold under the trademark "Door-Ease." On December 3, 1931, Harold filed with the County Clerk, Muskegon County, Michigan, a "Certificate of Persons Conducting Business Under Assumed Name." Leo was in the real estate business and Harold used Leo's office to keep his records, to receive telephone calls and as a mailing address. Harold's limited resources were soon exhausted. He was quite substantially in debt in 1932. At that time Leo was also heavily obligated on real estate mortgages. In September, 1932, Harold *69 assigned the business to Florence, Leo's wife, for the purpose of obtaining capital and of preventing his creditors from taking the business. Notice of assignment of the business to her was filed by Harold with the County Clerk on September 30, 1932, and on the same day Florence filed a certificate with the Clerk to the effect that she was doing business under the assumed name, American Grease Stick Company, as successor to Harold Rosen. From 1932 through 1938, partnership returns were filed by the company showing a division of the net profits after payment of salary to Harold in the proportion of 51 per cent to Harold, and 49 per cent to Florence. Florence was to furnish the necessary capital to the extent of her ability. She had some help from her family and was in a position to obtain money. She performed no personal services for the business. Loans made by Florence and the members of her family were included in an account carried on the books of the company under the style "Leo S. Rosen Special Loan Account." Prior to 1935, Leo devoted part time to the business of the company. Thereafter he devoted his full time as an employee. In 1934, Harold married Marcia who was a widow. *70 By her former marriage she had one son, whom Harold adopted. She had some money of her own and made loans to the company in 1935 and after, which were carried on the books of the business as an account payable to her. Other members of the family also made loans from time to time. In 1936, the family loans were subordinated to the claims of outside creditors. The following table shows the year end balances of loans to the company: Accts. Payable
1932
1933
1934
1935
1936
Leo Rosen et al.
$3,415.95
$6,559.34
$7,105.84
$5,975.84
$5,335.84
Harold Rosen
500.00
Marcia Rosen
1,428.00
1,850.00
Rena Deutsch
2,278.50
1,953.58
Rosen Interests
2,307.57
2,132.57
Ernest Klein
1,000.00
655.00
155.00
Isaac Rosen and
Isaac Rosen Est.
141.00
241.00
175.00
Accts. Payable
1937
1938
1939
1940
Leo Rosen et al.
$4,895.84
$3,945.84
$ 50.00
Harold Rosen
Marcia Rosen
1,050.00
800.00
475.00
Rena Deutsch
1,503.58
778.58
Rosen Interests
1,932.57
882.57
Ernest Klein
Isaac Rosen and
Isaac Rosen Est.
At the time Marcia made loans to the business, Harold was informed by his accountant *71 and by his attorney that under Michigan law a husband and wife could not be partners. Some time in 1938 Leo, who was then devoting his full time to the business as an employee and who had reduced his contingent indebtedness to a comparatively small amount, wanted to become a part owner of the business. He discussed the matter with Harold and Florence, who were willing for him to have a share in the business. Leo's counsel then informed him that if Florence made him a gift, it would have to be of her entire interest. On February 8, 1939, Harold, Leo, and Florence Rosen, the latter acting individually and as trustee, entered into an agreement which reads in part as follows: "1. That the said Harold M. Rosen and Leo S. Rosen do hereby become and will remain partners in the business of manufacturing, blending, compounding, buying, selling, and dealing in grease sticks, oils, wax lubricants, petroleum products, and of conducting a general manufacturing and distributing business for a period not limited by he terms of this agreement. "2. The business shall be conducted under the name and style of the American Grease Stick Company. The territorial scope of the operations of the business *72 shall have no limitations or restrictions. The headquarters of the business shall be in Greater Muskegon. Michigan, or such other place or places as the partners shall from time to time determine. "3. Both Harold M. Rosen and Leo S. Rosen will at all times, when physically able, diligently employ themselves in the business of the partnership and carry on the same to the greatest advantage thereof. "4. The capital and resources of the business shall consist of all the stock of material and merchandise; all machinery and tools of every description, all office furniture and fixtures, all moneys, all choses in action, bank accounts, contracts, accounts receivable and commercial paper, all formulae and trade secrets, all patents and patent rights issued or pending, all trademarks, registered or otherwise, issued or pending, all sales organization facilities, and everything else belonging to and being the entire business as a going concern, together with the Good Will of such business heretofore owned and conducted by Florence Rosen, doing business as the American Grease Stick Company, and located at No. 1146 Hoyt Street, Muskegon Heights, Michigan, all of which said capital, assets *73 and resources are, concurrent with the execution of this agreement, to be duly and properly transferred to said co-partnership by such conveyances and instruments as are necessary to make such transfers and to vest said co-partnership with the title thereto. "5. Within 15 days after the execution of this agreement, and as a part of the consideration hereof, it is understood and agreed that of the amount of approximately $3,900.00 owing by the American Grease Stick Company to Florence Rosen and Leo S. Rosen personally, as indicated on the books of the American Grease Stick Company in the account designated 'Leo S. Rosen Special Loan Account,' all of said amount shall be cancelled and turned into the said American Grease Stick Company as capital, with the exception of $700.00, which said $700.00 shall continue to be owing as an account payable and shown on the books of the American Grease Stick Company under the account designated 'Leo S. Rosen Special Loan Account' in the said amount of $700.00. "6. Any and all patents used in connection with the business heretofore obtained by Harold M. Rosen, or for which he has any application pending, are herewith assigned to and made a part *74 of the firm's assets. * * * * *
"13. The partners shall be entitled to ownership in the capital and resources of the said business, and also entitled to the net profits from the said business and liable for the obligations thereof in the following proportions: Harold M. Rosen 51%, Leo S. Rosen 49%. * * * * *
"16. This agreement shall be construed and does supersede and replace all previous agreements regarding the business of American Grease Stick Company, or any interest therein, made by or between any or all of the parties hereto in connection with all interest or ownership in and to the said American Grease Stick Company, and, in this respect, includes agreements with both Florence Rosen, individually, and Florence Rosen, as trustee." * * * * *
The item of "approximately $3,900" in paragraph 5 of that agreement refers to the figure of $3,945.84 listed in the above statement of loans to the partnership under the Leo Rosen Account at the end of 1938. On the same day Florence filed with the County Clerk a notice of assignment of the business to Harold and Leo, and the latter two filed a certificate that they were doing business under the assumed name, American *75 Grease Stick Company. Thereafter, Harold and Leo conducted the business as partners, having a 51 per cent interest and a 49 per cent interest, respectively. In the latter part of 1940, Wesley DeLong, the Rosen's auditor, told them that his partner, after making a considerable study of partnership cases pertaining to Michigan law, had concluded that it would then be possible for the brothers to make gifts to their wives of a portion of their holdings in the company. After talking with their attorney about the matter, Harold and Leo told their wives late in 1940 that they were going to give them interests in the business, to be effective as of January 1, 1941. Harold told their attorney to draw up an agreement in writing so as to give a 25 per cent interest to Marcia and a 22 per cent interest to Florence. From January, 1941, until the latter part of March of that year Harold and Marcia were away on a trip to California. On April 2, 1941, Harold, as first party, Leo, as second party, Marcia, as third party, and Florence, as fourth party, executed an agreement which, after reciting that on or about January 1, 1941, Harold had orally agreed to assign an undivided 25 per cent interest *76 in the assets and business of the partnership to Marcia and Leo to assign an undivided 22 per cent interest to Florence, reads as follows: "1. The parties hereto hereby confirm and agree to be bound by said oral agreements and the party of the first part hereby assigns. transfers and sets over unto the party of the third part an undivided twenty-five per cent (25%) interest, and the party of the second part hereby assigns, transfers and sets over unto the party of the fourth part an undivided twenty-two per cent (22%) interest in all of the machinery, tools and equipment of every description, all office furniture and fixtures, all contracts and books of account, and of everything else belonging to and being a part of the business as a going concern, together with the good will of such business, conducted by the undersigned, Harold M. Rosen and Leo S. Rosen, as copartners under the name and style of American Grease Stick Company, located at No. 1146 Hoyt Street, Muskegon Heights, Michigan. "2. This agreement shall become effective as of January 1, 1941, and the party of the third part and the party of the fourth part shall be entitled respectively to 25% and 22% of all the income *77 and profits from the business of the said co-partnership earned subsequent to said date remaining after the payment of salaries of the first party and of the second party, which shall be charged as an expense of the co-partnership business, but said third party and said fourth party shall not become personally liable for any of the obligations of said co-partnership. "3. The foregoing assignment shall not entitle the party of the third part or the party of the fourth part to become or be considered as partners in the said business, or to participate in the management of the business of said co-partnership, nor shall it give to either of said parties any right to in any way interfere with the said parties of the first and second part, Harold M. Rosen and Leo S. Rosen, in conducting said business; to determine the policies of the said business, including the decision to be made from time to time respecting the amount of earnings which shall be distributed or retained in the business as capital; or to limit or curtail the salaries to be drawn by said partners, Harold M. Rosen and Leo S. Rosen, from said business. "4. Amounts advanced from time to time, either to the party of the third *78 part or the party of the fourth part, during any fiscal year of the co-partnership shall be considered and treated as advances against her pro rata share of the partnership earnings, which are to be subject to distribution in the form of dividends during such year. Should the amounts so advanced to either of said last mentioned parties in any year be in excess of her pro rata share of earnings to be distributed for said year, said excess shall thereupon be treated as an amount owing by her to said co-partnership, and she shall be obligated to reimburse said co-partnership in the amount of said excess. "5. Said third party and said fourth party hereby accept said assignment subject to the foregoing terms, conditions, limitations and restrictions, and they severally agree to be bound thereby." Copies of the agreement were delivered to the wives. A supplemental agreement, executed by the same four parties on April 4, 1941, provided for the carrying of life insurance upon the lives of the partners, for the formation of a new partnership upon the death of either partner and for the incorporation of the business upon the happening of certain contingencies. It further provided that *79 no party to the agreement could sell, assign, or encumber his or her interest in the business or its assets without the written consent of all the other parties. The instrument also conains the following provision: "* * * Inasmuch as neither the party of the third part [Marcia] nor the party of the fourth part [Florence] has become a partner of the other parties to this agreement by reason of her ownership of an interest in the business of said co-partnership, the death of either the party of the third part or the party of the fourth part shall not operate to dissolve the partnership." Gift tax returns were filed by Harold and Leo, each reporting a gift to his wife of an interest in the business. Because of the exemptions and exclusions no tax was due thereon. In 1941 the single capital account of the company was divided into four individual accounts showing the respective interests of the brothers and their wives. Harold and Leo previously had had separate drawing accounts, and new drawing accounts were set up on the books for Marcia and Florence. The assistant cashier of the bank with which the company did business and the president of the company's major supplier were *80 informed in 1941 of the interests given to the wives. No change was made in 1941 in the Michigan registration of persons conducting business under an assumed name. The business of the American Grease Stick Company was the manufacturing and selling of the "Door-Ease" product and, in addition, a dripless oil and a rubber lubricant. There were substantial investments in inventories, accounts receivable, and manufacturing equipment, as shown by the following table: 12/31/38
12/31/39
12/31/40
12/31/41
Inventories
$ 9,278.78
$13,343.42
$16,082.03
$34,218.42
Trade Accounts Receivable
8,259.57
10,275.91
13,160.68
14,780.64
Fixed Assets
8,241.44
9,751.02
9,963.66
10,325.67
Trademarks and Patents
598.78
702.73
705.73
641.15
Net Worth
15,197.11
33,271.82
48,216.92
82,034.93
The gross receipts of the business, as reflected in the income tax returns, were $159,843.51 for 1939, $167,132.89 for 1940, and $227,229.27 for 1941. The cost of goods sold, exclusive of administrative and selling expenses, was $63,077.31 in 1939, $67,732.97 in 1940, and $92,921.97 in 1941. The net income reported in the returns was $44,892.38 in 1939, $50,794.87 *81 in 1940, and $75,984.40 for 1941. Substantial amounts were spent for advertising and sales promotion. The company's products were recommended by all the major automobile manufacturers, and sales were made to leading automobile jobbers throughout the United States and Canada, to the large oil companies, to chain stores, and to automobile accessory stores. By 1941 the company had representatives in distributing points in all the states and in many foreign countries. In 1941 Leo, a graduate of the University of Michigan College of Business Administration, was sales and office manager. He had charge of sales promotion, advertising, contacting men in the field organization, finances, bookkeeping, and office work. Harold was general production manager and had charge of production and research, supervising the general operation of the plant. He had no technical training and often consulted engineering and chemical experts in connection with development of the products and processes of the business. Advertising counsel also were frequently engaged by the company. The plant employed 15 or 16 people in 1941 and their monthly salaries averaged $1,500. There were 35 or 40 salesmen, to whom *82 commissions of approximately $20,000 were paid. In 1940 Harold Rosen drew a salary of $15,000, and Leo $13,500. In 1941 each drew a salary of $9,000. After the execution of the instruments of April 2 and April 4, 1941, there was no change in the every day operations of the business except for the bookkeeping entries establishing separate capital and drawing accounts. Harold and Leo continued to operate and control the business as they did before and performed the same services. Neither Marcia nor Florence performed any personal services for the company in 1941. They did not participate in or interfere in any way with the conduct and management of the business and had nothing to do with determining the policies to be pursued. They were paid no salaries and had nothing to say about what portion of the earnings would be distributed and what retained as capital, or about the amount of salaries to be drawn by their husbands. They contracted no debts in the name of the partnership. Harold and Leo alone determined what amounts of money would be subject to withdrawal. Neither Marcia nor Florence was authorized to sign checks drawn against the company's bank account. They made withdrawals *83 by obtaining checks from the bookkeeper. The checks had to be signed by either Leo or Harold and countersigned by the bookkeeper. When both Leo and Harold had to be away on business, they would leave signed blank checks with the bookkeeper, and their wives often made withdrawals when they were away by going to the bookkeeper and obtaining checks. The drawings of the wives were not the same. Their first withdrawals were made in April, 1941. Marcia's 1941 drawings totaled $8,248.96 and Florence's $5,317. Both Marcia and Florence had separate bank accounts and often deposited their withdrawals in those accounts. Each had an allowance from her husband for household expenses, which was larger in 1941 than in 1940. Harold and Marcia purchased their home jointly. During 1941, Marcia had no income except from the business. She used a portion of her partnership withdrawals to make payments on their home. She also used her withdrawals to purchase luxury furnishings for the home, carpeting, antique silver, etc. She sent some of the money to her son at college and with other portions of the funds she bought war bonds. Her husband was co-owner on some of the bonds and her son on others. She *84 also paid premiums on life insurance policies on her husband's life, she being the beneficiary of such policies. Harold bought her wearing apparel for her, with the exception of an occasional extravagant item. With her withdrawals from the business Florence bought some antique furniture, china, figurines, things for her children, and other luxury items. She also invested in war bonds. Leo paid for her wearing apparel. A Michigan intangible tax return for the year 1941 was filed by American Grease Stick Company, in which return Harold, Leo, Marcia, and Florence were shown as the partners. A federal partnership return of income for the year 1941 was filed in the name of the company, showing net income in the amount of $75,984.40, distributed in the following shares: Harold M. Rosen
$24,075.94
Marcia S. Rosen
14,496.11
Leo S. Rosen
24,655.79
Florence Rosen
12,756.56
$75,984.40
The shares of Harold and Leo include their salaries, $9,000 each. The respondent determined that 51 per cent of the partnership net income of $38,752.05 was taxable to Harold and that 49 per cent thereof, or $37,232.35, was taxable to Leo. Opinion ARUNDELL, Judge: In these *85 cases we are called upon to decide whether the net income of the American Grease Stick Company (hereinafter referred to as American) for the year 1941 is taxable to petitioners alone or proportionately to them and their wives. Petitioners contend that they made bona fide gifts to their wives of interests in American; that the wives invested such interests in the capital of American; that the wives were, in effect, limited partners for income tax purposes; and that, at all events, the income of American received by the wives was derived from property owned by them and therefore taxable to them. Respondent takes the position, in substance, that the arrangement between petitioners and their wives is but another scheme for the division of income among members of a family. It is our opinion that respondent did not err in holding the entire income of American taxable to the petitioners. At the outset, it may be observed that the very instrument in which the petitioners purported to give their wives interests in the business expressly provided that the wives should not "become or be considered as partners in the said business" and that they should not "become personally liable for any of *86 the obligations of said co-partnership". Again, in the supplemental agreement of April 4, 1941, it was provided that since the wives had not become partners, the death of either of them should not operate to dissolve the partnership between the petitioners. After the execution of those instruments, no change whatever, other than bookkeeping entries, was made in the every day operation of the business. No certificate of persons doing business under an assumed name, so as to show the interests of the wives, was filed with the County Clerk - a practice which had been diligently observed in all the previous transfers of ownership of interests in American. Petitioners continued to operate and control the business as they did before. Even in terms, they purported to divest themselves of as little dominion and control as possible - just sufficient, it would seem, to satisfy the barest formalities. Admittedly neither of the wives performed any personal services. They did not participate in or interfere in any way with the conduct and management and had no voice in the determination of policies and nothing to say about the use and control of the property which they allegedly "owned". They *87 were not authorized to sign checks drawn on partnership funds in the bank. They had nothing to say about the amount of salaries paid to petitioners, and had no voice in the determination of how much of the earnings from the property which they allegedly "owned" they could withdraw. What they did draw, they expended in the main for family purposes. There is no showing that the combined expenditures of husband and wife for such purposes differed materially in amount or in kind after the April 1941, agreements. Harold admitted to the Revenue Agent, Mr. Knoll, during an investigation in 1944, that he and Leo decided how much the wives would be permitted to withdraw from the business. Petitioners attempted to explain the provisions of the agreements to the effect that the wives should not become or be considered as partners by stating that such provisions were not consonant with then existing Michigan law. They testified that when they executed the 1939 partnership agreement between themselves, they wanted to bring their wives into American with them but were advised that husband and wife partnerships were not permitted under Michigan law. They testified, further, that the 1941 instruments *88 were executed because in the meantime their accountant and their attorney had informed them that it was then possible under Michigan law. Harold stated: A. Along the latter part of 1940, as I recall it, my auditor told me, "You know, you wanted to make your wife a partner in this business." I said that I did. He said, "I have learned that we can work that out." I was very happy to have that information and immediately told my wife that I could work out an arrangement whereby I could give her a proper interest in the company. Still, when the 1941 instruments were executed, the petitioners expressly provided that their wives should not be partners. It may be that there was some justifiable question about Michigan law with respect to husband and wife partnerships, cf. , but Michigan law apparently presented no obstacle to the formation of valid bona fide partnerships in other cases even prior to 1939. See, for example, , and , in each of which the partnership was formed in 1937. A more plausible explanation of the provisions stipulating that the *89 wives should not be partners, it seems to us, is that petitioners had no real purpose or intent to divest themselves of any ownership of property. The 1941 instruments, together with the subsequent conduct of the parties, are consonant with a plan and an intent to allocate a portion of the net income of American to the wives so as to reduce petitioners' surtax burden, petitioners at the same time retaining and exercising almost complete control and dominion over all the property and assets of the business. Furthermore, the apparent facility with which the, at least nominal, ownership of American shifted back and forth among the family members from time to time is not conducive to a belief that petitioners had a real intent irrevocably to divest themselves of, and to vest in their wives, all the attributes of ownership of a corpus or res, to which may be attributed the production of the income, or any part thereof, reported as the wives' distributive share. In a somewhat similar case, where a husband purported to give his wife an interest in his business but provided that she was "not to be considered as a partner in the" business and that she was not to be liable for losses, the *90 Circuit Court of Appeals for the Eighth Circuit held, affirming our memorandum decision, that the husband was taxable on the income reported as distributed to the wife. . Petitioners urge that the provisions granting them authority to conduct the business placed no condition or restrictions on the gifts of "interests" in the business; that their exclusive management must be viewed in relation to the partnership and not to the gifts; and that partners may agree to lodge in one or more partners the sole management of the business. We find no fault with such contentions as general propositions of law; but where, as here, it is highly questionable whether there was any real intent to divest one's self of ownership, to surrender dominion and control, not only what the parties purport to do but what they actually do becomes important. Petitioners rely principally upon the Tower and Scherer cases, supra, and upon , and . They might have cited many other cases in which family partnerships were recognized for tax purposes, but we think no useful purpose *91 would be served by reviewing those cases in detail and pointing out distinctions between them and the instant case, and it would of course be idle to attempt to reconcile all the decisions of this and other courts in family partnership cases. It may be observed, however, that in the cases particularly relied upon by petitioners, formal articles of partnership were executed, in which the wives were expressly recognized as partners, sharing in the profits and losses. In none of them (and two of them involved Michigan partnerships) was it provided that the wives should not "become or be considered as partners". In the final analysis, each family partnership case must be decided upon its own peculiar facts. We have set out in detail the reasons which bring us to the conclusion herein that in 1941 petitioners were not "carrying on business in partnership" with their wives, within the meaning of the revenue laws. What we have already said, we think, disposes also of petitioners' contention that even if the wives were not partners, the income of American received by them was derived from property owned by them and therefore taxable to them. We are unable to conclude that petitioners' *92 wives actually owned interests in the property of the business, that is, in a corpus or res, as distinguished from interests in the income. Petitioners have endeavored to come as close to the line as possible. We think they have overstepped it. In substance, to borrow Justice Cardozo's language in , petitioners have "contrived to keep the larger benefits of ownership and be relieved of the attendant burdens." Decisions will be entered for the respondent.